JESSE M. HODGMAN *vs.* ST. PAUL & CHICAGO RAILWAY COMPANY, impleaded, etc.

October 17, 1876.          .

**Railroad between St. Paul and Red Wing may be Complete without a Bridge across the Mississippi.**—In May, 1869, the city of Red Wing, under legislative authority for that purpose, duly entered into an agreement with the defendant company, for the issue of a certain amount of bonds to aid in the construction of defendant's railway between St. Paul and Winona, one of the stipulations of which required the company "fully to construct, equip, and put into successful operation for the transit of freight and passengers, that portion of its railway from St. Paul to Red Wing," (which crossed the Mississippi river at Hastings,) "on or before the 1st day of January, 1871," as a condition precedent to its right to receive any of such bonds. *Held,* that this did not require the company to construct a bridge at Hastings, but to provide such facilities for passing the river as, at the time of making the contract, were usual and customary, under like circumstances, in railroad transportation across said stream, and as were adequate and reasonably convenient in reference to such mode of transit.

**Construction of Contract by Acts of Parties.**—Upon an issue as to the performance of such stipulation, testimony tending to show that all heavy freights received by the company, for transportation from either of the points therein named to the other, had invariably been carried over another line of railway under its control, instead of the one in question, was competent evidence and admissible.

**Contract once Performed is not Affected by Subsequent Acts of Parties.**—In case the stipulation was substantially performed within the required time, any subsequent misconduct of the company in operating the road would not constitute a breach of the agreement.

Action to restrain the city of Red Wing, one of the defendants, from issuing to the defendant the St. Paul & Chicago Railway Company its municipal bonds, which, to the amount of $85,000, the city, under legislative authority, had contracted to issue to the company, on condition that its railway should be completed and put into successful operation between St. Paul and Winona, or some other point south of Red Wing having railway connection with Milwaukee and Chicago, on or before January 1, 1871. The principal of the breaches of this condition alleged in the complaint was the failure of the company to bridge the Mississippi river, between St. Paul and Red Wing, within the period limited in the contract. An order overruling the railway company's demurrer to the complaint was affirmed, on appeal, by this court, in *Hodgman* v. *Chicago & St. Paul Railway Co.*, 20 Minn. 48. The company thereupon answered the complaint, and the action was tried in the district court for Goodhue county, before *Crosby*, J., who ordered judgment for the plaintiff, perpetually enjoining the issue of the bonds. A new trial was refused, and the railway company appealed.

The city of St. Paul being situate on the left bank, and the cities of Hastings, Red Wing, and Winona on the right bank of the Mississippi, a bridge across that river is, as was found by the court, indispensable to a continuous line of railway between St. Paul and those cities, the most feasible point for constructing such bridge being that between East Hastings and Hastings, which are opposite each other on the river, and where the company, toward the close of the year 1871, completed a bridge, and supplied the only break in its continuous line of railroad between St. Paul and Winona. Before the erection of this bridge, the gap between the company's tracks on the opposite banks of the river at and opposite Hastings was 3,524 feet. This gap was made up of the river, 604 feet in width at the ordinary stage of water, and bottom lands, 2,920 feet wide, tim-

bered, and subject to overflow in extreme high water, but dry for ten or eleven months in the year. The court found that this break, while it existed, caused serious inconvenience to passengers, and delays in the transportation of passengers and freight, and increased charges therefor, the passage of the river being effected by means of a boat in the season of navigation, and open wagons and sleighs when the river was frozen; and that the break prevented the transportation of any freight, except light packages, over the railway between St. Paul and Red Wing, all heavy freight being sent between St. Paul and Red Wing over other railroads operated by the lessor of the St. Paul & Chicago railway, over a route sixty-two miles in length, the distance between the two places by the latter road being but forty-two miles.

*Bigelow, Flandrau & Clark*, for appellant.

*E. T. Wilder* and *J. C. McClure*, for respondent.

CORNELL, J.   By an act of the legislature, passed March 5, 1868, entitled "An act to authorize the city of Red Wing to issue bonds to aid in the construction of the St. Paul and Chicago railway through said city," (Sp. Laws 1868, c. 14,) the city was authorized, by its council, subject to a vote of the people, at any time prior to the first day of August, 1870, to issue its bonds to the extent of $100,000 in aid of such enterprise, and to enter into any agreement with said company, in relation to the terms, time, and conditions of such issue, as might be agreed upon. On February 8, 1869, this act was amended by removing the restriction as to the time when such authority conferred upon the city should be exercised, empowering it to issue the bonds "to aid in the construction of the St. Paul and Chicago railway," with this proviso, "that no such bonds shall be issued until so much of said railway as is or shall be located between the city of St. Paul and said city of Red Wing shall have been fully constructed, equipped, and put into successful operation for the transit of passengers

and freight." Sp. Laws 1869, c. 35. By the amended act the authority was given to the city council to enter into any agreement with any company having the right to construct such railway, in relation to the time, terms, and conditions of the bonds, and the issuance thereof, and to provide for their issue by an ordinance specifying such time, terms, and conditions, provided, among other things, that such agreement and ordinance should not take effect or be in force until ratified and approved by the qualified voters of the city, as therein provided.

Under this authority a contract was duly entered into between the city and the defendant company, on or about May 8, 1869, by an agreement and ordinance duly passed and ratified, the stipulations, terms, and conditions of which are, so far as material to this case, as follows: "It is mutually understood by and between the parties hereto that no portion of said bonds shall be issued until said railroad shall have been fully constructed, equipped, and put into successful operation for the transit of freight and passengers from the city of St. Paul, in the state of Minnesota, to the city of Winona, in said state, or to some point south of Red Wing connecting with some railway, so as to afford, in conjunction therewith and with other railways, direct railway transportation with Milwaukee and Chicago ; and said bonds, when so issued, shall each bear date subsequent to the completion, as above expressed, of said railway ; and that no such bonds shall be issued unless said railway shall be fully constructed, equipped, and put into successful operation for the transit of freight and passengers from St. Paul to said Red Wing, on or before the first day of January, A. D. 1871 ; " and the said company "covenants and agrees to construct, equip, and put into successful operation said railway, for the transit of freight and passengers from the city of St. Paul aforesaid to the city of Winona, in said state, or to some point south of Red Wing connecting with some railroad, so as to afford, in conjunc-

tion therewith and with other railroads, direct railroad transportation with Milwaukee and Chicago ; and the said party of the second part (the company) further agrees to fully construct and equip the said railway, and put the same into successful operation for the transit of freight and passengers from St. Paul aforesaid to said Red Wing, on or before the first day of January, A. D. 1871."

The ordinance, in terms, provides for the issuance of the bonds of the city, to an amount, etc., therein specified, "to aid the St. Paul and Chicago Railway Company in the construction of its railway" between St. Paul and the point or points therein stated, and contains these provisions : "Provided, that no such bonds shall be issued until said railway shall have been fully constructed, equipped, and put into successful operation for the transit of freight and passengers from the city of St. Paul, in the state of Minnesota, to the city of Winona, in said state, or to some other point south of Red Wing connecting with some railroad, so as to afford, in conjunction therewith and with other railroads, direct railway transportation with Milwaukee and Chicago ; and said bonds, when so issued, shall bear date of a day subsequent to the completion, as above expressed, of said railway ; and provided, further, that no such bonds shall be issued unless said railway shall be fully constructed, equipped, and put into successful operation for the transit of freight and passengers from St. Paul to said Red Wing, on or before the first day of January, A. D. 1871."

The first question of controlling importance to be considered in this case is whether, in the construction of defendant's railway, a bridge was required to be erected across the Mississippi river, by the terms of the contract between it and the city, as embodied in the written agreement and ordinance.   No express mention is made of any bridge, either in the agreement or ordinance ; and if its construction is required by the contract, it is because it is

a necessary and essential part of the railway which the company undertook " fully to construct, equip, and put into successful operation for the transit of freight and passengers," and without which said road would be incomplete and insufficient to answer the ends for which it was authorized to be built. Both the written agreement and the ordinance refer to the specific line of railway which the company had undertaken to construct, under and in pursuance of its charter, as the one to which aid was to be given, and which was to be constructed and put into operation. It is fair to assume that the kind and character of railway which the parties had in contemplation in making their agreement was that which the company had undertaken to build, under and in compliance with the provisions and requirements of its charter. This line of road had its origin in the act incorporating the Minnesota & Pacific Railroad Company, passed May 22, 1857, (Laws 1857, ex. sess., c. 1,) which authorized that company "to locate, construct, and operate a railroad, with one or more tracks, from Winona up the valley of the Mississippi river to St. Paul," (§ 25,) without designating any particular location of the road along said valley, or any place for crossing said river. On March 6, 1863, a grant of swamp lands was made in aid of the enterprise, "lying and being within the limits of seven miles on each side of the line of said branch road from St. Paul to Winona, as the same shall be located and constructed," conditioned upon the construction of twenty miles in three years, and the residue in five years thereafter, and providing, among other things, for the conveyance of the lands so granted, in parcels, upon the completion of each and every twenty continuous miles of road. Sp. Laws 1863, c. 4. In the amendment of the charter, on February 4, 1864, (Sp. Laws 1864, c. 3,) it was provided (§ 3) that the company then holding the franchises pertaining to the various lines of road and branches therein mentioned, and which included the one

in question, should have "the right to construct and maintain suitable bridges over any stream or river upon the line of its road and branches, or which may be required to connect the same with any other road within or without the state, provided suitable draws should be maintained over all navigable streams, so as not to materially impede navigation. By the act of March 2, 1865, (Sp. Laws 1865, c. 6,) the company was required (§ 1) to build this branch by way of, and through, Hastings, Red Wing, Lake City, Wabasha, and Minneiska, and to construct and put in complete running order twenty consecutive miles between Winona and St. Paul in two years. By the act of March 4, 1868, (Sp. Laws 1868, c. 11,) the time for the completion of "that portion of the railway between the city of St. Paul and a point on the Mississippi river, in the county of Washington, opposite the city of Hastings," was extended until December 15, 1869, and the company was relieved from the condition theretofore imposed which required the completion of twenty consecutive miles of road prior to any conveyance of lands, and, in lieu thereof, it was expressly enacted that it might select and have conveyed to it the quota of lands to which, under the then-existing laws, it would be entitled upon the completion of the first twenty consecutive miles of railway, whenever, within the time prescribed, it should complete the road from St. Paul to said point on the Mississippi river opposite Hastings, and grade the same from Hastings to Red Wing. On the following day the act was passed authorizing the city of Red Wing to loan its credit in aid of this enterprise, and of the construction of the railway through the city of Red Wing.

It is obvious that the aid which the city was authorized to give was to secure the construction of the identical road contemplated by the charter of the company, and which it was required to build in order to comply with its provisions; and, inasmuch as no particular mode of effecting a crossing of the Mississippi river is indicated by the agreement or

ordinance, it must be presumed that it was intended to be such as the company, under this legislation, was at liberty to adopt, in view of the character of the enterprise and the objects to be accomplished. The legislative intention in authorizing the location and construction of this branch road, its connection with any other railroad or branch, either in this state or the state of Wisconsin, and the operation of the same in connection therewith, (see original charter, § 7,) was to secure railroad communication and transportation with the eastern markets, in the usual and ordinary manner in which such communication and transportation had theretofore been effected between localities similarly situated and those markets. Did the legislature, in thus conferring upon the Minnesota & Pacific company, in 1857, the power to build a railroad from St. Paul to Winona, and to connect the same with any road in the state of Wisconsin—to accomplish which would necessarily occasion two crossings of the Mississippi river—contemplate imposing upon the company the obligation of bridging that stream at both or either of such crossings?

The answer to this question, it seems to us, must be in the negative. The court must take notice of the fact that this river is a navigable stream, subject to the commercial power of congress, which has been exerted over it in various ways ever since the foundation of the national government; that the right to free and unrestricted navigation, beyond any state interference or control, is forever secured to all the citizens of the United States, so that no company can derive any authority from any state to erect or place across or over it any bridge or structure, at any place or in any manner, that shall materially obstruct its navigability and use as a commercial highway; and it makes no difference whether, at the place of crossing, both banks of the river be wholly within the limits of the state, or not. *State of Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518, 564–5.

When the original charter was granted, in 1857, it is an

historical fact that, between St. Paul and the mouth of the Mississippi, no attempt had been made to erect a bridge over the Mississippi in connection with any railroad enterprise, save at Rock Island, and the right to maintain one there was disputed, and only settled, after years of litigation, by the passage, in July, 1868, of a joint resolution upon the subject by congress, causing the removal of the old bridge, and the erection of a new one in accordance with the provisions of that act. 15 U. S. Stat. at Large, 258. Since the erection of the first Rock Island bridge, congress, in the exercise of its powers to regulate commerce among the several states, and to establish post-roads, has repeatedly authorized bridges to be built over the Mississippi, and established them as post-routes, at the same time prescribing such regulations and conditions, in regard to their construction, use, and maintenance, as in its judgment would effectually guard against their becoming seriously obstructive to navigation. The right thus asserted by congress has never, to our knowledge, been judicially questioned, although its power in this respect has never been recognized as sufficient to uphold a structure which, from its location or character, must necessarily prove a serious injury or material obstruction to the navigability of the river. It is not claimed that any congressional authority has ever been given for the construction of any bridge at or near Hastings. Under these circumstances, and in view of these facts, it is not to be presumed that the state, in granting the right to build the road, intended to impose the obligation of building a bridge, especially in the absence of anything in the charter, in express terms or by necessary implication, requiring it. The general authority conferred—to build all necessary bridges over any streams—must be construed as referring to such only as were under its exclusive jurisdiction and control, and not to the Mississippi. The practicability of constructing a bridge, so as not to obstruct navigation, necessarily depended somewhat upon the location of the

road with reference to the place of crossing the river, its grade at that point, the height and character of the banks, the condition of the current, and a variety of engineering considerations of which no correct knowledge could be had till after actual location. Hastings was first definitely fixed as a point on the line of the road, by legislative action, in 1865. Prior to this the location of the line had been left to the discretion of the company, so that it was confined to the valley of the Mississippi. It can hardly be supposed that the legislature, in 1857, without any knowledge as to the place where the road was to cross the river, and in ignorance of the requisite facts upon which depended the feasibility of building a bridge at such place without serious injury to navigation, intended to compel its construction as a part of the road, conceding that it had the unquestioned power so to do.

By the act of March 2, 1865, the company could only acquire title to its quota of land for the first twenty continuous miles of completed road built under the act of March 6, 1863, upon the performance of the condition of constructing, and putting in complete running order, twenty consecutive miles thereof. Instead of commencing the construction at some point where twenty consecutive miles could be built and completed without the intervention of the river, it began at St. Paul, and built to a point on the river opposite Hastings—a less distance than twenty miles—and, as a continuation of the construction on the opposite side a sufficient distance to make up the deficiency might not be regarded a compliance with this condition, by reason of the use of the words "consecutive" and "continuous," the legislature relieved it from this obligation, on March 4, 1868, and the company, under this legislation, received its grant of land without any controversy in regard to the erection of a bridge. Such was the condition of the legislation upon this subject at the time the city of Red Wing was authorized to loan its credit in aid of the construction

of said road, and when it made its contract with the company in pursuance of this authority.

These considerations and facts, taken in connection with the uncontroverted testimony of Mr. Rice—that, prior to the charter and the said agreement, no bridge had ever been constructed across the Mississippi, in the Northwest, by any railroad company, and that railroad connections had uniformly been established across said stream by other means—leave no reasonable doubt that the intention of the legislature upon the subject points to the conclusion that a railway, fully constructed in the usual and ordinary manner of other railroads under like circumstances, with the same or like efficient means of transit for its passengers and freight across said river—regard being had to the character, objects, and requirements of the enterprise—was all that was contemplated and required by the charter; and that it was in reference to the construction of such a railroad that the agreement and ordinance in question were made, seems equally free from doubt. The act enabling the city to enter into the agreement was to aid the St. Paul & Chicago railway—in other words, the identical road contemplated by the charter of the company. The ordinance states its purpose to be to aid the company in the construction of its railway, etc. Nothing is said in any of the stipulations indicating, either in terms or by any fair implication, that the road which the company was undertaking to build by the agreement was any other or different than the one which it had undertaken to construct under its charter, and was required to complete to render its swamp-land grant available. The stipulation that no bonds should issue "until said railway should have been fully constructed, equipped, and put into successful operation for the transit of freight and passengers from St. Paul to Winona, connecting with some railroad, so as to afford, in conjunction therewith and with other railroads, direct railway transportation with Milwaukee and Chicago," indicates an eastern outlet by

railroad as its main purpose, and sheds light upon the question as to the construction of a bridge across the river. No bridge at that time existed, either at Winona or any point in this state, and, for aught that appears, none was in contemplation of erection within the time limited for the company to build its road, nor had any congressional authority been obtained for that purpose. It must, therefore, have been intended by the parties that such connection was to be made, and direct railway transportation secured, in some other way than by a bridge—by the use of such other and usual means of making connection and transit as then prevailed, under similar circumstances, in the Northwest. If this was the intention in respect to this crossing, it must have been such as to the crossing between St. Paul and Red Wing, inasmuch as the language employed in reference to the latter is less strong, as indicating the purpose of a bridge, than in the former, which not only requires a fully-constructed and completed railway, but such a connection with some line of road opposite Winona as should afford direct railway transportation east. If direct railway transportation could be effected with Milwaukee and Chicago from the west side of the Mississippi river, without the intervention of a bridge, within the meaning of the ordinance and contract, it certainly could between St. Paul and Red Wing.

It may be urged that the contract and ordinance contemplated the construction of a bridge because, as is found by the court, it was the purpose of the company to build one at this point, at all times from and after 1863. It is a sufficient answer to this that it does not appear from the findings of fact, or otherwise, that, at the time of entering into this contract with the city, or at any time prior thereto, the company had ever contemplated the erection of a bridge across the Mississippi, except as an ultimate possibility dependent upon circumstances not likely to occur for several years after the construction of the road to Winona. The uncontradicted testimony of Mr. Rice is that " the imme-

diate construction of a bridge at Hastings was not embraced in the plan of the construction of the road. It was not expected to be built for several years after the construction to Winona," and its construction was first finally determined upon in September, 1870. Moreover, it does not appear from the findings, or otherwise, that the purpose of the company in reference to the bridge was known to the city or its agents at the time the contract was made, or that it was made in reference to it. The uncontradicted testimony in the case tends strongly to the conclusion that, at the time the contract in question was entered into, the usual and ordinary mode of effecting the transit of freight and passengers transported by railroad across the Mississippi river, throughout the Northwest, especially during the " earlier stages of its business," was that which was adopted by the company in the present instance.

In view of these considerations we are of the opinion that the construction of a bridge was not absolutely required of the company by its agreement with the city. Any other mode of effecting a transfer of its passengers and freight across the river, such as was then usual and customary under like or similar circumstances, and as was adequate and reasonably convenient as such to accomplish the transit, would be a substantial compliance with the requirements of the agreement and ordinance in this respect. If the place of a bridge was supplied in this way in the present instance, and the points selected on either side of the river for making the transfer were suitable and reasonably proper—having reference to the mode of transfer, the nature of the stream, its adjacent banks, the convenience of the public, and all the attendant circumstances—and no portion of the line of road was left incomplete except as between these points of transfer, then, in our judgment, the road was fully constructed within the meaning of the ordinance and agreement. Whether the requisite facilities for crossing the river, as herein indicated, were provided by the company

in the present instance, and whether the selected points of transfer were properly chosen and suitable, under the circumstances, were questions of fact to be determined from the evidence, in order to ascertain and fix the rights of the respective parties.

It would seem from the whole evidence and findings of fact that the case was disposed of by the court below mainly, if not wholly, upon the erroneous theory that the construction of a bridge across the Mississippi, at the point of crossing at Hastings, within the time fixed by the ordinance, was an indispensable condition precedent to the right of the company to receive the bonds in question ; for the findings are silent upon the question whether the mode of transfer provided was a usual and customary one in crossing the Mississippi river, and, as such, efficient, adequate, and reasonably convenient to effect the transit of both passengers and freight ; and, also, upon the question whether the selected points for making the transfer were suitable and proper under the circumstances, though it is expressly found " that to a continuous railroad, upon the route aforesaid, from St. Paul to Red Wing, a bridge across the Mississippi was and is indispensable"—a fact irrelevant to the real merits of the controversy, inasmuch as, in our judgment, a railroad with an unbroken track across such river was neither intended nor required by the ordinance and agreement. Because of the manifest adoption of this erroneous theory by the court below, in its consideration of the case, a new trial must be granted. What conclusion the district court would have reached in regard to the performance of the conditions of the agreement and ordinance as herein construed, but for this error, it is impossible to determine ; and, as either party may, upon the view of the case herein presented, desire to introduce other or additional testimony, it is unnecessary to consider the effect of the evidence now before us in this regard, or its sufficiency or insufficiency upon this question.

A question is made, however, in regard to the admissibility and effect of evidence tending to show that the company, prior to the construction of the bridge, invariably or usually transported all bulky freight between St. Paul and Red Wing, in the absence of any instructions from the shipper as to its route, over its line of road *via* Farmington. Such conduct, unexplained, might be regarded in the light of an admission on the part of the company—though by no means conclusive—that its river route was insufficiently constructed or equipped to do that kind of business, and furnished, perhaps, some evidence of a negative character that such railway had never been put into successful operation. Such evidence is, therefore, competent. If, however, it should affirmatively appear that its river line of road was, in fact, constructed and equipped according to the terms of its contract with the city, as herein construed, and, as thus constructed and equipped, was put into successful operation within the time therein required, then it is a matter of no importance which of the two routes was the more expensive, or the more convenient or economical, nor which it preferred to use in respect to particular classes of business, or actually did use in the absence of any particular request. Neither could it be a matter of any moment, so far as any rights or obligations growing out of this contract are concerned, what the subsequent conduct of the company was in operating its road, either in regard to its rates of fare or the mode in which it did its business.

Order reversed, and new trial granted.